UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STACY FRYE,

Plaintiff,

v.

PEDIATRIC & ADOLESCENT ADVANCE CARE, PLLC et al.,

Defendants.

Case No. 26-10555
Honorable Laurie J. Michelson

**OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS [19]**

For a few turbulent months in 2025, Stacy Frye, a pediatric orthopedic and sports medicine doctor, ran a practice under the umbrella of Pediatric & Adolescent Advance Care, PLLC and its owner, Dr. Faisal Mawri. Almost immediately upon joining the PLLC, Frye spotted red flags in its billing procedures. She repeatedly raised concerns. But she says little was done and her worry for her professional reputation grew. By early September—just eight months after this partnership began—Frye gave her 90-days' notice. The PLLC waived the notice and terminated her immediately.

Frye claims that her termination was unlawful retaliation for her legitimate efforts to prevent fraud on the government. She brings a retaliation claim under the False Claims Act against both the PLLC and Mawri, as well as a breach of contract and termination in violation of public policy claim under Michigan law.

Defendants contend that none of Frye's claims state a plausible claim for relief and they moved to dismiss them. (ECF No. 19.) For the reasons that follow, the motion is granted as to Frye's breach of contract claim against Mawri but denied in all other respects.

**I.**

"On a motion to dismiss, the district court 'must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Tulis v. Bennett*, No. 25-5430, 2026 U.S. App. LEXIS 672, at *2–3 (6th Cir. Jan. 9, 2026) (quoting *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018).588 (6th Cir. 2018)). Thus, the Court recites the facts as alleged in Frye's complaint.

In June 2025, Stacy Frye, M.D., a "pediatric orthopedics and sports medicine specialist," entered a for-cause employment contract with Pediatric & Adolescent Advance Care, PLLC (the "clinic" or "PLLC"), to join its practice as a Physician of Non-Operative Pediatric Orthopedics & Sports Medicine. (ECF No. 1, PageID.5, 6.)

Dr. Faisal Mawri, owner of the clinic, provided "general pediatric and adolescent" care to patients (alongside some other medical professionals), while Frye was brought on to provide specialized, "non-operative pediatric orthopedic services," primarily through referrals from Mawri and his colleagues. (*See id.*) Despite operating together under one PLLC, Mawri and the clinic "held out to the public" that Frye was a solo practitioner. (*See* ECF No. 1, PageID.6.)

Frye's employment contract provided, in relevant part, that "either party may terminate th[e] Agreement at any time, with or without cause, upon at least ninety

days prior written notice to the other party." (*Id.* at PageID.23.) Additionally, the PLLC could terminate Frye for material breach, provided that Frye "fail[ed] to cure such breach within fifteen (15) days after receiving written notice of such breach from the [PLLC]." (*Id.*) The effective date of the contract was January 6, 2025. (*Id.* at PageID.5.) Frye began her work at the clinic the same day. (*Id.*) Problems arose not long after.

First, there were some complications with getting Frye's practice approved by several major insurance providers. (*Id.* at PageID.7.) As a result, Frye had a high number of out-of-network patients. (*Id.*) And because Defendants dragged their feet in establishing a fee schedule for Frye's services, her many out-of-network patients were not given "good faith estimates" of what the cost of her services would be. (*See id.*) This raised alarm bells for Frye, who believed this lack of transparency might violate state and federal law—specifically the Federal No Surprises Act (Pub. L. No. 116-260, § 109, 134 Stat. 1182 (2020)) and Michigan's Suprise Medical Billing Law (Mich. Comp. Laws. § 333.23509). (*Id.* at PageID.8.) So Frye "repeatedly reported and opposed, verbally and in writing," Defendants' failure to comply with these requirements. (*Id.*)

Further still, Frye almost immediately detected issues in Defendants' billing practices. (*See id.* at PageID.7.) The PLLC billed both private insurers and the Centers for Medicare and Medicaid (CMS) for its services, but "most" of the clinic's bills went to CMS. (*Id.* at PageID.5–6.) Likewise, "more" of Frye's services were billed to CMS than private insurers. (*Id.* at PageID.6.)

In March 2025, Frye reported to Defendants that any patients Mawri and his team referred to her should be billed as established patients, not new patients. (*Id.* at PageID.8.) But Defendants "continually directed [her] to fraudulently bill for all patients as if they were 'new patients,'" because services to new patients are billed at a higher rate. (*Id.* at PageID.8, 9.)

Then, in April 2025, the PLLC's biller instructed Frye to code some of her services as "post-operative." (*Id.* at PageID.9.) Frye opposed this too, explaining that as a non-surgical doctor, none of her services could be characterized as "post-operative." (*Id.*) In June 2025, however, the biller continued to direct Frye to change her codes to these "more lucrative, but factually incorrect, surgical codes." (*Id.*)

That same month, Frye noticed that Mawri frequently billed the government for services at the highest reimbursement rates ("level 5"), even when his clinical notes did not support billing at that level. (*Id.*) She also found that Mawri referred patients to her for services "that did not correspond to the purported reason for referral, that were not medically indicated, and that lacked documented examinations to support the high level of service billed to the government." (*Id.* at PageID.10). All of this, Frye says, demonstrated to her that Mawri and the clinic were up-coding and unnecessarily referring patients "in order to bill the government" more frequently and at higher rates. (*See id.* at PageID.8–10.)

So, "in or around June 2025," Frye reported her "concerns about the fraudulent billing" to the clinic's CEO, Darrick Conley, "including her concern that Defendant Mawri's documentation did not support the billing levels used, that referrals

appeared to be medically unnecessary, and that she was concerned about the legitimacy of Defendants' billing practices." (*Id.* at PageID.10.) She continued these reports to Conley "throughout July and August 2025." (*See id.* at PageID.11.)

In July, Frye learned that some patients had complained to the clinic that they were "scheduled for appointments for unexplained reasons," only to later discover the visit was medically unnecessary. (*Id.*) Nevertheless, the clinic billed CMS for these unnecessary appointments. (*Id.*) Also around this time, they changed Frye's long-held tax identification code designation from "pediatrics" to "sports medicine," to obtain higher reimbursement rates. (*Id.* at PageID.12.)

Despite Frye's complaints, the concerning practices continued. (*Id.* at PagID.11.) Mawri continued to instruct Frye to "bill for as many level 5 visits as possible." (*Id.*) Frye continued to resist, telling both Mawri and Conley that this would "amount to fraudulent billing." (*Id.*) For several months thereafter, Frye says Defendants continued to "double bill[] for her services, upcod[e], . . . and otherwise chang[e] codes she placed into medical records," all to increase their billing revenues. (*Id.* at PageID.12.)

Things came to a head in September. On September 11, 2025, Frye called Conley to again report billing issues and "asked him to provide her with direction as to her concerns." (*Id.*) In response, Mawri called Frye. (*Id.*) Frye told Mawri that some of the clinic's practices were "not legal" and that she was not comfortable with them. (*Id.*) Mawri told her to "stop talking about billing [and] just see patients." (*Id.*)

So the next day, September 12, Frye sent a lengthy email to Conley and Mawri (among others), again reporting her concern that up-codes were being used to "fraudulently increase billing revenues from the government." (*Id.* at PageID.13–14.) A few days later, on September 16, the clinic's biller informed Frye that Defendants planned to "resubmit previously denied claims for reimbursement under a new tax identification number to obtain payment." (*Id.* at PageID.14–15.) That same day, Frye emailed Mawri again to "document her concern with his decision to fraudulently bill the government by resubmitting previously denied claims for reimbursement under a new tax identification number." (*Id.* at PageID.15.)

The next day, on September 17, Frye tendered a letter of resignation and 90-days' notice to Conley and Mawri, citing her concerns regarding their business practices. (*Id.*) Frye continued to work as usual. (*Id.*) But on September 21, Mawri "unilaterally" cancelled all her appointments. (*Id.* at PageID.16.) On September 22, Frye received a letter from the clinic's attorney accusing her of failing to appear to work and citing her "discontent" with the billing practices. (*Id.* at PageID.17.) The letter indicated that Frye's "employment would be terminated effective immediately," for cause. (*Id.* at PageID.16–17.)

In February 2026, Frye brought this suit against Mawri and his PLLC, alleging violations of the False Claims Act and Michigan law. (ECF No. 1). The Court previously declined to exercise supplemental jurisdiction over Frye's false light claim. (ECF No. 14.) Defendants now move to dismiss each of the remaining claims. (ECF No. 19.)

## II.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must "state[] a claim for relief that is plausible, when measured against the elements" of her claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)); *see also Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) ("a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

Ordinarily, "this analysis focuses on the allegations in the complaint." *Keene Grp., Inc. v. City of Cincinnati, Ohio*, 998 F.3d 306, 310–311 (6th Cir. 2021). But the Court may also consider exhibits or "other materials that are integral to the complaint," as well as "public records." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 467 (6th Cir. 2011). Defendants have appended some of the September 2025 emails between Frye and Conley to their motion. (ECF Nos. 19-1–19-4.) Because this email thread is referenced in Frye's complaint (ECF No. 1, PageID.14–15), and Frye does not object to its submission, the Court will consider it in its analysis.

### A. False Claims Act Retaliation

The False Claims Act, 31 U.S.C. § 3729–3733, is a federal statute designed to "prevent the commission of fraud against the federal government." *U.S. ex rel. Purcell*

*v. MWI Corp.*, 824 F. Supp. 2d 12, 15 (D.D.C. 2011). It authorizes the Attorney General or a private person to initiate a civil action that alleges such fraud. *See* 31 U.S.C. § 3730(a)–(b). The latter category of suits—private enforcement actions—are called "qui tam" actions. *Miller v. Abbott Lab'ys*, 648 F. App'x 555, 559 (6th Cir. 2016) (citing *U.S. ex rel. Eisenstein v. City of New York, New York*, 556 U.S. 928, 932 (2009)). "Because employees naturally became a primary source of *qui tam* litigation due to their insider status, Congress amended the FCA in 1986 to protect employees who investigate or help investigate potential fraud from the retaliatory acts of their employers." *Arthurs v. Glob. TPA LLC*, 208 F. Supp. 3d 1260, 1264 (M.D. Fla. 2015) (citing 31 U.S.C. § 3730).

And in 2009, Congress amended the FCA again to broaden the scope of protected activity. *See, e.g.*, *Mikhaeil v. Walgreens Inc.*, No. 13-14107, 2015 U.S. Dist. LEXIS 21682, at *18–19 (E.D. Mich. Feb. 24, 2015) (citing 31 U.S.C. § 3730(h)(1)). The amendments clarified that employees are not only protected in activities in furtherance of an FCA suit, but also for any efforts to "stop violations of the Act," including internal reports to supervisors. *See, e.g.*, *Tibor v. Michigan Orthopaedic Inst.*, 72 F. Supp. 3d 750, 761 (E.D. Mich. 2014); *see also Baier v. Cmty. Home Health Care, Inc.*, No. 24-00276, 2025 U.S. Dist. LEXIS 163596, at *10 (S.D. Ohio, Aug. 22, 2025) ("§ 3730(h) was amended in 2009 to expand protections beyond activities undertaken in furtherance of a *qui tam* action. The amended language explicitly protects 'other efforts to stop' violations of the FCA." (quoting 31 U.S.C. § 3730(h))). Frye brings her FCA claim under this amended retaliation provision.

To state a claim for retaliation under this provision of the FCA a plaintiff must show: (1) she plaintiff engaged in a protected activity, (2) her employer knew she engaged in the protected activity, and (3) her employer discharged or otherwise discriminated against her as a result. *Fakorede v. Mid-S. Heart Ctr., P.C.*, 709 F. App'x 787, 789 (6th Cir. 2017) (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003)); *see also Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 398 (6th Cir. 2015). Defendants argue that Frye has not established any of these three elements. The Court addresses each in turn.

**1. Protected Activity**

What constitutes protected activity in this context is circumscribed by the FCA's purpose. Protected activity "must relate to 'exposing *fraud*' or 'involvement with a *false claims* disclosure.'" *Mehlman v. Cincinnati Child.'s Hosp. Med. Ctr.*, No. 20-813, 2021 U.S. Dist. LEXIS 150679, at *14 (S.D. Ohio Aug. 11, 2021) (emphasis added) (quoting *McKenzie v. BellSouth Telecommunications, Inc. (McKenzie II)*, 219 F.3d 508, 515 (6th Cir. 2000).) Put differently, Frye must have been retaliated against for attempting to stop or expose *fraud* on the government—not merely fraud on patients, or general regulatory noncompliance. *See, e.g.*, *Jones-McNamara*, 630 F. App'x at 399. Internal complaints can satisfy this standard. *Fakorede*, 709 F. App'x at 790. But there must still be "some nexus between the [internal] report and 'exposing fraud'" on the federal government. *Mikhaeil,* 2015 U.S. Dist. LEXIS 21682, at *20. Merely urging and employer to comply with federal law is not enough. *See, e.g.*, *Baier*, 2025 U.S. Dist. LEXIS 163596, at *14 ("'merely grumbling to the employer

about . . . regulatory violations,' which, though may give cause for concern, do '"not satisfy the [protected activity] requirement."').

Defendants argue that Frye cannot meet this standard because she made only "generalized grievances" in her resignation letter, and her complaints of "potential issues with billing private insurers or state agencies . . . do not relate to allegations of fraud on the federal government." (ECF No. 19, PageID.111–113.)

True, Frye's September 12 email, which Defendants largely rely on, does not specify concerns about CMS billing. (ECF No. 19, PageID.112.) But that email is not the only report Frye claims to have made. She alleges that she reported verbally and in writing, on several occasions, that Defendants were engaged in fraudulent billing of the federal government. (*See* ECF No. 1, PageID.10 ("[I]t appeared [to plaintiff] that Defendant Mari was referring patients to Plaintiff without medically indicated reasons . . . in order to *bill the government* for his referral and her services. In and around June 2025, Plaintiff *reported the above observations and concerns* about fraudulent billing to [Conley]"); *id.* at PageID.11 ("Defendant PLLC *fraudulently billed CMS* for these appointments. Plaintiff continued to report her concerns about *these fraudulent billing practices* to Mr. Conley throughout July and August 2025.") (emphases added).) At this stage, the Court must accept those well-pled factual allegations as true. *See, e.g.*, *Baier*, 2025 U.S. Dist. LEXIS 163596, at *13.

Further still, Frye's September 16 email to Mawri contains even more specific allegations of fraud on the federal government. There, Frye expressed her concern that, ""[r]efiling [previously denied claims] under a different Tax ID to circumvent an

out-of-network denial is treated by payers as a false claim and may violate . . . federal false claims laws. This poses serious risk to the practice and to individual providers, including . . . civil penalties." (ECF No. 19-2, PageID.132.) *See, e.g.*, *Zimmerman v. Elizabeth A. Pensler, D.O., PLLC*, 23-11634, 2024 U.S. Dist. LEXIS 148851, at *11 (E.D. Mich. Aug. 20, 2024) ("Plaintiff alleged that she believed Defendant's billing practices did not comport with guidance from CMS—a federal agency. Thus, the Court finds that Plaintiff's allegations are sufficient to plead the protected activity element of her FCA retaliation claim.").

Even Frye's more generalized complaints about the company's billing practices may be read, by inference, as concerns of fraud on the government, as most of the clinic's insurance claims were submitted to CMS—not private insurers. *United States ex rel. Crockett v. Complete Fitness Rehab., Inc.*, 721 F. App'x 451, 461 (6th Cir. 2018). ("Where, as here, otherwise ordinary complaints about medical ethics are *inherently* tied to the standards for Medicare billing and where, as here, the whistleblower is clearly using Medicare-billing terminology when complaining to her superiors, she has pled the notice element of an FCA retaliation claim.").

So Frye's complaint clears this first hurdle.

**2. Notice**

The second element of an FCA retaliation claim is notice.

As an initial matter, the parties dispute the applicable legal standard. Before the 2009 amendments, a plaintiff could only satisfy § 3720(h)'s notice requirement by pleading that defendants had notice that she was "either taking action in furtherance

of a private *qui tam* action or assisting in an FCA action brought by the government." *Yuhasz*, 341 F.3d at 567. But because the amendments expanded "protected activity" beyond actual participation in an FCA case, various courts have questioned whether that notice standard has changed or disappeared entirely. *See, e.g.*, *Bourne v. Provider Servs. Holdings, LLC*, No. 12- 935, 2025 U.S. Dist. LEXIS 57365, at *22 (S.D. Ohio Mar. 27, 2025) ("[A]fter the 2009 amendment, courts assumed that the notice element no longer required plaintiffs to show that they had made clear to their employer that they intended to bring or assist in an FCA action."). The tension between the old notice standard and new protected activity definition is plain: If a plaintiff no longer has to show that she was working toward an FCA *case* to plead protected activity, must she still put her employer on *notice* that she was?

Many courts, including this one, have said no and done away with the *Yuhasz* notice standard. *See, e.g.*, *Cephas-Hill v. Linden Med. Center/Mid-Ohio Family Practice Assocs.*, No. 20-4281, 2022 U.S. Dist. LEXIS 184876, at *9–10 (S.D. Ohio Aug. 2, 2022) (collecting cases); *see also Zimmerman*, 2024 U.S. Dist. LEXIS 148851, at *11–12 (finding that the *Yuhasz* opinion was superseded by statute through the 2009 amendments); *Mikhaeil*, 2015 U.S. Dist. LEXIS 21682, at *25–26 ("[b]y reporting her concerns directly to [her supervisor], Plaintiff satisfied the notice element[.]").

The Sixth Circuit has not spoken clearly on the issue. In a footnote in a 2015 unpublished opinion, the Sixth Circuit explained,

> [g]iven that the current version of § 3730(h) no longer limits protected activity to actions in furtherance of potential FCA actions, *Yuhasz*'s

> requirement that employees involved in investigating potential fraud must 'make clear their intentions of bringing or assisting in an FCA action,' *id.*, is no longer required by the statutory text. *See, e.g., Mikhaeil v. Walgreens Inc.*, No. 13-14107, 2015 U.S. Dist. LEXIS 21682, 2015 WL 778179, at *9 (E.D. Mich. Feb. 24, 2015) (reasoning that *Yuhasz* no longer applies in light of the amendments to § 3730(h))

*Jones-McNamara*, 630 F. App'x at 409.

But then, in a more recent unpublished case, *United States v. Wal-Mart Stores E. LP*, the Sixth Circuit seemingly revived the *Yuhasz* standard, finding that a plaintiff who made internal reports of fraud failed to adequately plead notice. 858 F. App'x 876, 880 (6th Cir. 2021) ("Employees 'must make clear their intentions of bringing or assisting in an FCA action' to show retaliation.") (citing *Yuhasz*, 341 F.3d at 566–68); *see also Baier*, 2025 U.S. Dist. LEXIS 163596, at *11 (finding that *Wal-Mart* "appears to mandate that district courts apply a pre-amendment notice standard.").

The parties acknowledge that courts are split on how to apply *Wal-Mart*, if at all. (*See* ECF No. 19, PageID.116; ECF No. 26, PageID.176); *compare Rowe v. Fresenius Mgmt. Servs., Inc.*, No. 23-331, 2024 U.S. Dist. LEXIS 175716, at *35 (E.D. Tenn. Sept. 27, 2024) (applying the *Yuhasz* notice-standard post *Wal-Mart*), *with Zimmerman*, 2024 U.S. Dist. LEXIS 148851, at *12 (reasoning that the *Yuhasz* notice requirement "no longer applies"). But this unsettled issue of law is ultimately of no consequence here because Frye's complaint meets the pre-amendment notice standard, articulated in *McKenzie I*. *See United States ex rel. McKenzie v. BellSouth Telecomms., Inc. (McKenzie I)*, 123 F.3d 935, 943–44 (6th Cir. 1997).

"[E]ven under the pre-amendment statutory scheme, the Sixth Circuit did not require that an employee explicitly inform their employer that they were cooperating with the government or planning to file a *qui tam* action." *Bourne v. Provider Servs. Holdings, LLC,* 2025 U.S. Dist. LEXIS 57365, at *24 (S.D. Ohio, Mar. 27, 2025). Rather, she need only allege "'activities 'that would have given [the defendant] reason to believe that she was contemplating a qui tam action.'" *U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449 (6th Cir. 2008) (quoting *McKenzie I*, 123 F.3d at 944) (alteration in original); *see also McKenzie II*, 219 F.3d at 517; *Rowe*, 2024 U.S. Dist. LEXIS 175716, at *35. An employee's internal report raising concerns of "illegal, unlawful or false-claims against the government," is sufficient to meet this standard. *Bourne*, 2025 U.S. Dist. LEXIS 57365, at *24 (quoting *U.S. ex rel. Marlar*, 525 F.3d at 450).

In *Marlar*, the court found that plaintiff's internal complaint met the *Yuhasz* notice standard because "she allege[d] that she observed purportedly fraudulent activity and confronted her employer about it . . . . She therefore connected her complaint of [defendant's] actions . . . to a concern about fraud on the government." 525 F.3d at 450. Frye has done the same. She alleges that she observed what she believed was fraud on the government, confronted her employer about it, and invoked concerns of illegality in her reports. (ECF No. 1, PageID.14 ("Plaintiff reported that charges and billing codes she entered in electronic medical records were being altered in order to 'up-code' and otherwise fraudulently increase billing revenues from the government"); *id.* at PageID.15 ("Plaintiff emailed Defendant Mawri to document her

concern with his decision to fraudulently bill the government."); ECF No. 19-2, PageID.132 ("Refiling under a different Tax ID . . . is treated by payers as a false claim and may violate . . . federal false-claims laws . . . I cannot participate in or be associated with billing practices that could be construed as fraudulent."). In fact, Defendants' termination letter may even be read to suggest that they were concerned about potential legal action: "it appears from your recent spate of correspondence that you have intentions beyond a simple billing issue." (ECF No. 19-4, PageID.134.)

It may be that Frye's allegations of numerous, clear verbal complaints of fraud on the government, or corresponding notice to her employer, are not borne out by discovery. *See U.S. ex rel. Marlar*, 525 F.3d at 450 (noting that plaintiff's claim in *McKenzie I* died at summary judgment because she "failed to establish a sufficient nexus between her internal complaints and a qui tam action."). But at this stage, and without further clarification from the Sixth Circuit on the current scope of the FCA-retaliation notice requirement, Frye's allegations that she repeatedly raised her concerns of illegal and fraudulent conduct, including fraud on the government, seem facially sufficient to have put Defendants on notice that Frye was contemplating an FCA claim.

**3. Causation**

That leaves causation. Here again, the parties dispute the proper legal standard.

In *McKenzie II*, the Sixth Circuit held that to plead causation under the FCA's retaliation provision, the plaintiff need only show that the adverse action she alleged

was "motivated, at least in part" by her protected activity. *McKenzie II*, 219 F.3d at 518. Frye believes this law governs. Defendants say that because § 3730(h) has identical causation language as Title VII and the Age Discrimination in Employment Act, the Court should look to more recent law interpreting causation in those contexts. (ECF No. 19, PageID.117.) And those cases apply a somewhat stricter, "but-for" cause standard. *See, e.g.*, *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020). But here, once more, this dispute makes no difference, as Frye satisfies even the stricter, but-for standard that Defendants endorse.

She alleges that on September 17, she tendered her resignation to Defendants, in the immediate wake of email exchanges regarding her concerns of billing fraud, including fraud on the government. (ECF No. 1, PageID.15.) That letter made clear that billing concerns were the reason for her resignation. (*Id.*) Just a few days later, on September 21, Mawri "unilaterally" cancelled all of Frye's scheduled appointments, and on September 22, Defendants sent her a termination letter. (*Id.*) Frye understood the letter to mean she was "terminated effective immediately because of her reports about Defendants' fraudulent billing practices." (*Id.* at PageID.16.) The close temporal proximity between Frye's complaints, her resignation because of her fraud concerns, and her termination, are more than sufficient to plausibly show that Frye's reports were the but-for cause of her termination. *See, e.g.*, *Rowe*, 2024 U.S. Dist. LEXIS 175716, at *37 ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence

of a causal connection.") (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

Further still, the Court need not rely on inferences to find that Frye's complaints of fraud were a but-for cause of her termination: Defendants' say so themselves in the termination letter. There, Defendants explained, "[W]e are writing to address your email of September 16th [invoking federal false claims laws] and the correspondence that followed [Frye's resignation letter] . . . . [I]t seems evident from your conduct . . . that billing concerns took priority over patient care . . . *under these circumstances*, [defendant] is waiving the 90-day notice period." (ECF No. 19-4, PageID.135 (emphasis added).) (*See also* ECF No. 19-4, PageID.135 ("Regarding your most recent comment about the practice and how it chooses to advise its patients . . . you are misconstruing facts. At this point, you have no reason to have any contact with patients of [Defendants]").)

Defendants likely have a different interpretation of this letter. But at this stage of the case, the Court must construe the facts in the complaint in the light most favorable to Frye. *See, e.g.*, *Rowe*, 2024 U.S. Dist. LEXIS 17516, at *46. Doing so leads the Court to conclude that she has plausibly pled the reason for her termination was her alleged protected activity.

In sum, Frye has plausibly alleged all three elements of an FCA retaliation claim. Thus, Defendants' motion to dismiss that claim is denied.

**B. Termination in Violation of Public Policy**

"Michigan only recognizes the common-law claim of wrongful discharge in violation of public policy 'where there also is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue.'" *United States ex rel. Crockett v. Complete Fitness Rehab., Inc.*, 721 F. App'x 451, 462 (6th Cir. 2018) (quoting *Dudewicz v. Norris-Schmid, Inc.*, 503 N.W.2d 645, 650 (Mich. 1993)). Defendants argue that because the FCA retaliation provision governs here, Frye is precluded from bringing a duplicative violation of public policy claim based on the same facts. *See, e.g.*, *Zimmerman*, 2024 U.S. Dist. LEXIS 148851, at *13; *Mikhaeil*, 2015 U.S. Dist. LEXIS 21682, at *34–35.

In response, Frye asserts that her public policy claim "is based solely on [her] reports, opposition to, and refusal to acquiesce in violations of federal and state 'No Surprises' statutes." (ECF No. 26, PageID.179.) Both parties apparently agree that is not "protected" activity within the meaning of the FCA. (ECF No. 19, PageID.11.) Thus, Frye maintains that her public policy claim, relying on different facts and law, is not foreclosed by § 3730(h). *See Stegall v. Res. Tech. Corp.*, 22 N.W.3d 410, 417 (Mich. 2024) (explaining that the preemption rule only applies "where a legislative enactment has not only explicitly prohibited the discharge of an employee acting in accordance with a statutory right or duty, but also provided an exclusive remedy for violation of that explicit prohibition.'") (citation omitted). The Court agrees.[1]

[1] Even under the strict but-for causation standard employed under Title VII, "an employer can have multiple 'but-for' causes behind a decision. Put differently, an adverse action can have several motivations that are each independently sufficient to

Alternatively, Defendants argue that Frye fails to state a claim based on her reports of the No-Suprises act violations because "Michigan does not recognize a common law cause of action for an employee who has been discharged for reporting violations of law to a superior." (ECF No. 27, PageID.247 (citing *Mikhaeil*, 2015 U.S. Dist. LEXIS 21682, at *35).) But the Michigan Supreme Court has recently held otherwise. *See Stegall v. Res. Tech. Corp.*, 976 N.W.2d 667, 668 (Mich. 2022) ("We see no reason why limiting public-policy claims to external reports would serve the welfare of the people of Michigan"); *see also Lofquist-DeYoung v. DTN Mgmt. Co.*, 2025 U.S. Dist. LEXIS 102803, at *9–10 (W.D. Mich. May 30, 2025) ("The notion that a demand to violate the law is necessary before a discharge will be actionable is belied by [*Stegall*], which held that reporting a suspected violation of law to one's employer can be a sufficient basis for a public-policy claim.") (citation omitted).

With that in mind, the Court finds that Frye has stated a plausible claim under Michigan public policy. She alleges that Defendants violated state and federal "No Surprises" laws by failing to establish a fee schedule for her services. She "refused to acquiesce[sic]" in these violations and reported her concerns as to these violations, both verbally and in writing. (ECF No. 1, PageID.22.) Shortly thereafter, she was terminated. (*Id.*) Defendants do little to challenge these allegations, instead arguing

---

prompt the employer's decision." *Odell v. Kalitta Air, LLC*, 678 F. Supp. 3d 904, 923–24 (E.D. Mich. 2023) (citation omitted). So the Court's finding in the FCA context that Frye has adequately alleged that her complaints of fraud on the government were a but-for cause of her termination does not foreclose the Court from also finding, in the state law context, that Frye's complaints of no-surprises law violations were *also* a but-for cause of her termination.

(inaccurately) that "plaintiff does not allege she refrained from violating the law" and focusing on its preemption theory. (ECF No. 27, PageID.248.)

So, while close, the Court finds Frye's allegations sufficient to state a claim that her termination was in violation of Michigan public policy. *Carr v. Arlington/Roe & Co.*, No. 25-12004, 2025 U.S. Dist. LEXIS 277598, at *4 (E.D. Mich. Dec. 22, 2025) ("Public policy in Michigan 'is violated when . . . (b) the employee is discharged for refusing to violate the law.'") (citing *Lewandowski v. Nuclear Mgmt. Co.*, 724 N.W.2d 718, 723 (Mich. Ct. App. 2006); *see also Lofquist-DeYoung*, 2025 U.S. Dist. LEXIS 102803, at *9–10 (finding that plaintiff stated a plausible claim for termination in violation of public policy and explaining that the employer need not have "affirmatively demand[ed]" that employee participate in the violations for her conduct to be protected).

**C. Breach of Contract**

That leaves Frye's breach of contract claim.

Frye claims that her immediate termination "for cause" was unfounded because the "material breach" Defendants accused her of—walking off the job—never actually happened. (ECF No. 1, PageID.17.) In fact, she says she was ready and willing to come to work, but Mawri unilaterally cancelled all of her appointments. (ECF No. 1, PageID.16.) She also argues that Defendants were required to pay her for the full 90-day notice period, even though they waived it. (ECF No. 26, PageID.179–180.) And, if Defendants wanted to terminate her immediately, Frye

says the agreement obligated Defendants to give her 15 days' notice and an opportunity to cure the alleged breach. (*Id.* at PageID.180.)

Defendants do not contest that there was a binding contract, that they terminated Frye without 15 days' notice, and that she was not paid thereafter. (*See* ECF No. 19, PageID.108, 122–23.) They only dispute whether the contract obligated them to do so. (ECF No. 27, PageID.248–249.)

But again, the Court must take Frye's well-plead factual allegations as true. She says she never walked off the job or otherwise breached the agreement (ECF No. 1, PageID.17) and was nonetheless terminated "for cause." (ECF No. 1, PageID.24.). As a result, she suffered damages. (ECF No. 1, PageID.25.) Accordingly, Frye has stated a plausible claim of breach of contract. *See, e.g.*, *Frisco Auto Acquisitions, Inc. v. FCA US, LLC*, No. 24-13431, 2026 U.S. Dist. LEXIS 14847, at *5 (E.D. Mich. Jan. 27, 2026) (denying motion to dismiss on a Michigan breach of contract claim where plaintiff alleged "the existence and terms of a contract, that the defendant breached its terms, and that the breach caused damages to the plaintiff") (citations omitted).

Alternatively, Defendants argue this count should be dismissed as to Mawri because he was not a party to the contract—his PLLC was. (ECF No. 19, PageID.122.) The Court agrees.

"It is a longstanding principle of Michigan law that corporate officers and agents generally are not personally liable for breach of contract on the part of the company." *Smart Recovery Techs. LLC v. Supplies Plus MI LLC*, No. 24-7406, 2026 U.S. Dist. LEXIS 58847, at *55 (S.D.N.Y. Mar. 20, 2026) (citing *Cowan v. Stubborn*

*Rebel Farms*, No. 365169/367451, 2025 Mich. App. LEXIS 6962, at *10 (Mich. Ct. App. Aug. 26, 2025). And Frye's complaint contains no allegations indicating that Mawri "intended to be personally bound by the contract." *See Cowan*, 2025 Mich. App. LEXIS 6962 at *10. The mere fact that Mawri signed the contract on behalf of his PLLC is insufficient to suggest otherwise. *See Innovation Ventures, LLC v. Liquid Mfg., LLC*, 885 N.W.2d 861, 866 n.4 (Mich. 2016) ([Individual defendant] Andrew Krause signed the Nondisclosure Agreement in his capacity as the managing member of [corporate defendant]. He was not a party to the Nondisclosure Agreement in his individual capacity. We leave undisturbed the trial court's finding that Krause was not individually liable under the Nondisclosure Agreement because he was not bound by it.")

Accordingly, the claim is dismissed as to Mawri but survives as to the PLLC.

**III.**

For the foregoing reasons, Defendants' motion to dismiss is granted as to the breach of contract claim against Defendant Mawri only but denied in all other respects.

IT IS SO ORDERED.

Dated: August 19, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
United States District Judge